RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0067p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

WILLIAM LAPLANTE,

*Plaintiff-Appellee*,

v.

No. 21-1371

CITY OF BATTLE CREEK, MICHIGAN; MIKAEL ZIEGLER
and BRICE KERSCHEN, individually and in their official
capacities,

*Defendants-Appellants*.

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:19-cv-00166—Janet T. Neff, District Judge.

Argued:  January 27, 2022

Decided and Filed:  April 8, 2022

Before:  CLAY, GRIFFIN, and STRANCH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Paul D. Hudson, MILLER CANFIELD, Kalamazoo, Michigan, for Appellants.
Shawn C. Cabot, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for
Appellee.  **ON BRIEF:**  Paul D. Hudson, Amanda Rauh-Bieri, MILLER CANFIELD,
Kalamazoo, Michigan, Jill Humphreys Steele, CITY OF BATTLE CREEK, Battle Creek,
Michigan, for Appellants.  Shawn C. Cabot, CHRISTOPHER TRAINOR & ASSOCIATES,
White Lake, Michigan, for Appellee.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.    Defendants, Officers Mikael Ziegler ("Officer Ziegler" or "Ziegler") and Brice Kerschen ("Officer Kerschen" or "Kerschen"), appeal the district court's order denying their motion for summary judgment in Plaintiff William LaPlante's ("Plaintiff" or "LaPlante") 42 U.S.C. § 1983 excessive force action.  Plaintiff alleges that Defendants violated his Fourth Amendment rights when Ziegler threw him to the ground in a takedown maneuver and Kerschen failed to intervene to prevent that use of force.  For the reasons that follow, we **AFFIRM** the district court's denial of qualified immunity as to Defendant Ziegler and **REVERSE** the district court's denial of qualified immunity as to Defendant Kerschen and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Factual Background

Most of the incident giving rise to this lawsuit was captured on dash-camera video.  At 2:58 a.m. on May 27, 2016, while performing patrol duties in Battle Creek, Michigan, Officers Ziegler and Kerschen activated their patrol car lights to stop Plaintiff's vehicle.  Plaintiff stopped as soon as the officers activated their lights.  At that point, the passenger, Ryan Robbins ("Robbins"), exited the vehicle and began to walk away.  Robbins' exit prompted Officer Ziegler to loudly yell, "Get in the car, now" as he approached the vehicle.  (MVR Video, R. 60-2, Ex. B at 00:35–00:40.)  With his taser in his extended right hand, Officer Ziegler quickly moved toward the passenger's side of Plaintiff's vehicle.  Ziegler then yelled once again, in an even louder tone, ordering Robbins to "Get in the car, now!"  (*Id.* at 00:39–00:40.)  Robbins raised his hands in the air and moved back toward the vehicle, and Officer Kerschen approached Robbins.  Robbins knelt and put his hands in the air as Kerschen approached him.

Moments later, Officer Ziegler proceeded to the driver's side of the vehicle  with his taser still in his right hand.  As he approached Plaintiff, Ziegler said, "Hey."  (*Id.* at 00:46–00:47.)

Plaintiff, who was in the driver's seat, had opened his car door and placed at least one foot on the ground outside of the vehicle. He was allegedly intoxicated.[1]

Plaintiff proceeded to exit the vehicle with an open can of beer in his right hand. At that point, with his taser still in his right hand and in close proximity to Plaintiff, Ziegler stated, "Hey, just show me your hands, now." (*Id.* at 00:43–00:49.) Plaintiff said, "Dude, I'm not doin . . . ,'" and finished exiting the vehicle with his back to Ziegler. (*Id.* at 00:49–00:52.) Ziegler ordered Plaintiff to put the beer down two times. When Plaintiff failed to put the beer down, Ziegler knocked it to the ground.[2] At that point, Plaintiff took a step toward the front of the car and extended his hand forward against the car's frame, which caused the car to lurch forward a short distance.[3] Ziegler continued to face Plaintiff's back, and Plaintiff moved forward alongside the car. Ziegler then firmly told Plaintiff to "quit moving around" while simultaneously placing the taser against Plaintiff's back.[4] (*Id.* at 00:54–00:56.) He then told Plaintiff to put his hands behind his back.[5] When Plaintiff failed to do so and subsequently bent over,[6] Ziegler firmly said, "Put your hands behind your back or I'm gonna tase you." (*Id.* at 00:59–01:01.) At that point, Plaintiff, still bent forward, reached his right hand over the car and placed it at his side. Ziegler said, "Put your fuckin' hands behind your back, now." (*Id.* at 01:01–01:03.)

---

[1]Plaintiff's blood alcohol test, which resulted from a search warrant executed at a hospital approximately three hours later, revealed that Plaintiff's blood alcohol level ("BAC") was 0.115g/ml of blood.

[2]The parties dispute whether Plaintiff was "attempting to be cooperative" during this sequence and whether Officer Ziegler gave Plaintiff "ample opportunity" to comply with his orders. (*Compare* Appellee's Br. 11 *with* Appellants' Br. 5.)

[3]According to Plaintiff, his vehicle allegedly had a "problem with park" because "[t]he cable from the shifter" was not working. (*See* Pl.'s Dep., R. 60, Ex. A, Page ID # 377.)

[4]Plaintiff argues that Officer Ziegler "needlessly pushed [Plaintiff] into the corner of the open car door and escalated the situation by yelling into [Plaintiff]'s face, 'quit moving around.'" (Appellee's Br. 11.)

[5]Plaintiff claims that he was "not told he was under arrest" at any point during the interaction. (Appellee's Br. 29.) However, he testified that he understood that he was being detained. Additionally, Plaintiff does not claim that the application of the handcuffs was excessive.

[6]The parties dispute whether Plaintiff bent over on his own accord or was instead forced to bend down by Officer Ziegler, "thereby continuing to unnecessarily heighten and increase the tension in the situation[.]" (*Compare* Appellee's Br. 11–12 ("Despite [Plaintiff]'s lack of resistance, [Defendant] bent [Plaintiff] forward into the corner of the open car door . . . .") *with* Appellants' Br. 5 ("Officer Ziegler tells Plaintiff to 'put your hands behind your back, now!' but Plaintiff instead bends forward and leans into the car.").)

Plaintiff next turned his face slightly toward Ziegler and stated "Dude, I'm not movin' around, man, I'm sorry." (*Id.* at 01:04–01:06.)  He then moved his hands toward his back. Plaintiff leaned slightly back and looked at Ziegler in the eyes, at which point Ziegler pulled Plaintiff toward him and firmly said, "Well don't move!" (*Id.* at 01:05–01:07.)  In response, Plaintiff said, "Alright!" (*Id.* at 01:07.)  Ziegler then said, "Stay right there," and he put his taser, which was in his right hand, back in its holster. (*Id.* at 01:08–01:09.)  Plaintiff then asked, "What's wrong, dude?" (*Id.*)  Ziegler said, "*You* are what is wrong! You're driving." (*Id.* at 01:08–01:11 (emphasis added).)  Plaintiff brought his hands forward, removing them from the position behind his back.  He then raised his hands in the air above his head, with a ninety-degree bend at each of his elbows.  Ziegler once again stated, "Put your fuckin' hands behind your back." (*Id.* at 01:11–01:14.)  As Ziegler said those words, Plaintiff took one step with his right foot and proceeded to bend his knees into a squat stance.  Simultaneously, he rotated his hands down from over his head so that his arms were perpendicular to his body.  Ziegler then grabbed Plaintiff's shoulders, bent his knees, and pulled Plaintiff towards the ground,[7] causing Plaintiff to land on the street in a prone position.

As this occurred, Officer Kerschen ran over from the passenger's side of the vehicle after securing Robbins' handcuffs.  The officers struggled to handcuff Plaintiff, who continued to move once he was on the ground.[8]  Amidst various groans, Plaintiff stated, "What the fuck, man?" (*Id.* at 01:19–01:21.)  Ziegler once again told Plaintiff to put his hands behind his back. Plaintiff continued to groan.  Plaintiff then said, "I ain't doing nothing, dude!" (*Id.* at 01:34–01:36.)  Ziegler once again told Plaintiff to put his hands behind his back.  Plaintiff then exclaimed, "Here, take my hands!  God damn!  Take them!" (*Id.* at 01:37–01:40.)  Ziegler then firmly said, "put 'em behind your back." (*Id.* at 01:40–01:42.)  Plaintiff then said, "Take them!

---

[7]Plaintiff emphasizes that the maneuver was *not* an "arm-bar takedown, which is used to guide citizens to the ground . . . ." (*Compare* Appellee's Br. 13 *with* Appellants' Br. 19, 23.)

[8]While the dash cam footage does not show the entire period during which the officers attempted to handcuff Plaintiff, the officers' microphones were on, and voices can be heard and distinguished.  Additionally, the bottom-left quadrant of the video footage *does* show Ziegler and Plaintiff immediately after Ziegler employed the takedown maneuver.  The video shows that Plaintiff attempted to get up from the ground as Ziegler applied downward force to restrain and handcuff Plaintiff.  While the parties dispute whether Officer Ziegler lost his balance as he performed the maneuver, the video shows that Ziegler readjusted his footing after Plaintiff attempted to rise from the ground.

I ain't do nothin,' dude.  Go ahead!'" (*Id.* at 01:42–01:48.)  Officer Ziegler repeated his request that Plaintiff put his hands behind his back.  Plaintiff then said, "I am not doin' nothin.'" (*Id.* at 01:50–01:51.)  Ziegler then stated, "Put 'em behind your back and don't move." (*Id.* at 01:51–01:54.)  Plaintiff immediately said, "Alright!  God damn, man." (*Id.* at 01:54–01:55.)  Ziegler then loudly exclaimed, "Stay right there!" (*Id.* at 01:55–01:57.)  Plaintiff then stated, "I am not fuckin' doin' nothin,' man." (*Id.* at 01:50–02:01.)  Several seconds later, Ziegler announced over his radio that Plaintiff was in custody.  Plaintiff was standing at this point, with his hands cuffed behind his back.  It took approximately one minute and thirty seconds to effectuate Plaintiff's arrest.

Following his arrest, Plaintiff had several scrapes and lacerations on the left side of his face, particularly around his brow ridge and cheekbone.  Plaintiff also began to complain about pain in his elbow.  He loudly grunted and cried out in pain as he paced next to the police vehicle, and he eventually bent down.  Simultaneously, Ziegler discussed information regarding the incident via radio.

Less than a minute after the officers effectuated Plaintiff's arrest, Officer Ziegler notified police dispatch that Plaintiff was experiencing pain in his elbow.  Afterward, Plaintiff and Ziegler then discussed whether Plaintiff had complied with Ziegler's orders prior to the arrest.

Officer Ziegler then proceeded to inspect Plaintiff's vehicle, specifically the front left bumper area that allegedly hit the car that was parked in front of it.  He picked up the beer can and looked inside Plaintiff's vehicle from which he recovered an item for inspection.  He subsequently returned the item to the vehicle.  Plaintiff then stated, "I've done nothing but cooperate, my handcuffs are put on me so tight I can't even feel my hands." (*Id.* at 05:17–05:19.)  At that point, Ziegler said, "Okay, we'll fix 'em." (*Id.* at 05:21–05:23.)  Ziegler loosened the handcuffs at Plaintiff's request.  Plaintiff continued to insist that he did not do anything, and Ziegler stated in response that, "You get handcuffed when you're in the car and people act like that." (*Id.* at 05:35–05:39.)

Plaintiff was later treated by Lifecare Ambulance Services ("Lifecare").  Lifecare transported Plaintiff to Bronson Battle Creek Hospital for additional treatment, and he was later

taken to Calhoun County Jail.  Medical personnel determined that Plaintiff  had dislocated his left elbow and sustained a small avulsion fracture.  In the criminal case related to this incident, Plaintiff pleaded guilty to a felony charge of operating while under the influence of alcohol and a high misdemeanor charge of attempted obstruction of a police officer.

The police report relating to this incident fills some gaps left by the video, photographs, and Joint Statement.  First, it indicates the officers' alleged reasons for initially stopping Plaintiff's vehicle.  The report states that they "observed a silver 4-door vehicle . . . rapidly accelerating and breaking [sic] . . . [and] squeeling [sic] the tires and swerving on the roadway . . . [so they] decided to catch up to this vehicle and make a traffic stop on it for careless driving and suspected OUIL"  (Police Report, R. 60-7, Ex. G, Page ID # 617.)  Officer Kerschen allegedly attempted to call dispatch before the officers exited the police car, however, both officers claim he was unable to do so because Robbins immediately attempted to flee, and they decided to give chase.  The police report further indicates that the officers discovered that Plaintiff had an outstanding felony warrant for absconding parole.  Finally, the report indicates that the officers recovered marijuana from Plaintiff's vehicle.

Plaintiff's medical records confirm his elbow dislocation and fracture.  The records also reflect that on the night of the incident, Plaintiff denied having any head injuries, neck pain, back pain, leg pain, or hip pain.  However, Plaintiff subsequently sought medical support for chronic and recurring headaches, dental pain, persistent elbow pain and stiffness, and general weakness.  Plaintiff also claims that the encounter caused him chronic anxiety, nightmares, and difficulty sleeping.  Plaintiff's medical history further indicates that prior to the relevant encounter, he had three arm surgeries between 2002 and 2015—two on his right arm, and one that was unspecified.  Additionally, the medical history indicates that Plaintiff had previously experienced a "separation of [the left] AC joint," a joint in the shoulder complex which connects the collarbone to the shoulder blade.[9]  (Medical Records, R. 60-8, Ex. H, Page ID # 656–57.)

---

[9]This information is relevant to the Court's assessment of Plaintiff's injuries.  *See Scheffler v. Lee*, 752 F. App'x 239, 250 (6th Cir 2018) ("An excessive force claim 'may be established through evidence of severe injury . . . .'") (quoting *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 407 (6th Cir. 2009)).  Specifically, it indicates that Plaintiff's left elbow dislocation occurred in the context of prior procedures and existing trauma in the arm and shoulder region of the left side of his body.  (Medical Records, R. 60-8, Ex. H, Page ID # 649; Pl.'s Dep.,

## B.  Procedural History

Plaintiff filed his complaint in March 2019.  He listed Officers Ziegler and Kerschen, as well as the City of Battle Creek ("Battle Creek"), as Defendants.  Defendant Battle Creek filed an answer in which it raised various affirmative defenses, including qualified immunity.  Defendants Ziegler and Kerschen also filed an answer, which also raised various affirmative defenses including qualified immunity.  Plaintiff denied "each and every one of Defendants' Affirmative Defenses."  (Answer to Affirmative Defenses, R. 8, Page ID # 37–38; Answer to Affirmative Defenses, R. 12, Page ID # 53–54.)

The district court dismissed the claim against Battle Creek with prejudice pursuant to a voluntary dismissal by Plaintiff and a joint stipulation by all three Defendants.  Officers Ziegler and Kerschen then filed a motion for summary judgment.  The parties also filed a joint statement of facts.  The district court held a motion hearing on March 18, 2021.  The same day, the court issued an order in accordance with its bench opinion, which denied Ziegler and Kerschen's motion for summary judgment on the basis of qualified immunity.  Defendants timely appealed.

## II.  DISCUSSION

## A.  Standard of Review

We review a district court's denial of qualified immunity *de novo*.  *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006).  Although a district court's factual findings are not reviewable on interlocutory appeal, *id.* at 742, "where a district court's denial of summary judgment may appear to be based on factual issues, we may nonetheless review that court's determination if it 'hinges on legal errors as to whether the factual disputes (a) are genuine and (b) concern material facts.'"  *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 356 (6th Cir. 2013) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009)).  At the summary judgment stage, courts are required to "view the facts and draw reasonable inferences in 'the light most favorable to the party opposing the summary judgment motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)) (per

R. 60-1, Page ID # 265–66 (Plaintiff notes that his left arm has lasting impairments and weakness due to injuries from a 2010 motor vehicle accident in which his shoulder joint was separated).)

curiam) (brackets omitted).  If the evidence would allow a reasonable jury to find in favor of a non-moving party, summary judgment may not be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"There is, however, an added wrinkle" where the record contains "a videotape capturing the events in question." *Scott*, 550 U.S. at 378.  Because facts "must be viewed in the light most favorable to the nonmoving party only if there is a '*genuine*' dispute as to those facts," we may not adopt a version of the facts that is "blatantly contradicted" by video footage that is not "doctored or altered in any way" and which clearly "depicts . . . [the events that] actually happened." *Id.* at 378–80 (quoting Fed. R. Civ. P. 56(c)) (emphasis added).  But we must nonetheless "view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff," *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017) (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)), and must also "make all reasonable inferences in their favor when undertaking the qualified immunity analysis on summary judgment, *Godawa*, 798 F.3d at 463; *see also Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 783–84 (6th Cir. 2004) (Clay, J., dissenting) (concluding that where video footage is unclear and could support differing outcomes, courts should view the facts in the light most favorable to the non-moving party) (citing *Headwaters Forest Def. v. Cnty. of Humboldt*, 211 F.3d 1121, 1132 n.5 (9th Cir. 2000) ("The videotape evidence here appears to raise more questions than it answers . . . .")).

## B.  Analysis

In reviewing an order denying qualified immunity, the Court considers (1) whether an "official's conduct . . . violate[d] a constitutional right," and, if so, (2) whether "that right was . . . clearly established at the time of the conduct." *Latits*, 878 F.3d at 547 (citing *Godawa*, 798 F.3d at 462–63 (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001))).  We take each in turn.

### i.  Constitutional Violation

The use of excessive force during an arrest is unreasonable and violates the Fourth Amendment. *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)).  Courts consider "three factors . . . in determining the

reasonableness of force used" by a police officer: "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and [(3)] whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007) (citing *Graham*, 490 U.S. at 396). "These factors are not an exhaustive list," *id.*, because the ultimate question is whether "the totality of the circumstances justifies [the] particular sort of seizure" that took place, *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985) (brackets and ellipse omitted)).

Importantly, the inquiry is not whether *any* force was justified, but "whether the [officer] 'could reasonably use the *degree* of force'" that was employed. *Roell v. Hamilton Cnty.*, 870 F.3d 471, 483 (6th Cir. 2017) (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013)) (emphasis in original). An officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," given the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. However, "just because we must look at the circumstances through the eyes of a reasonable officer does not mean . . . that we must accept the officers' subjective view of the facts when making this assessment." *Jacobs v. Alam*, 915 F.3d 1028, 1041 (6th Cir. 2019). "Rather, 'the action must be viewed in light of the surrounding circumstances.'" *Palma v. Johns*, No. 21-3315, 2022 WL 594046, at *5 (6th Cir. Feb. 28, 2022) (quoting *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005)).

### a. Claim Against Officer Ziegler

There is no dispute that Officer Ziegler employed a takedown maneuver and accordingly used physical force to bring Plaintiff to the ground. Ziegler engaged in the maneuver only after Plaintiff failed to comply with a number of the officer's verbal orders to show his hands, put down his beer, and put his hands behind his back. But because the orders were given in rapid succession over the course of only thirty seconds, it was not clear whether Plaintiff understood or was given sufficient time or opportunity to comply with some of the orders before he was thrown to the ground. Consequently, there are genuine issues of material fact regarding the extent of

Plaintiff's cooperation, the degree of Ziegler's subsequent force, and the reasonableness of the force employed.

The police report states that the officers found probable cause to arrest LaPlante for: (1) resisting and obstructing the police; (2) resisting and obstructing justice; (3) driving with a suspended license; and (4) operating a vehicle under the influence of liquor. Plaintiff pleaded guilty to a felony charge of operating a vehicle while under the influence of alcohol and a high misdemeanor charge of attempted obstruction of a police officer. However, viewing the facts in the light most favorable to Plaintiff requires us to look at the nature and severity of Plaintiff's offense at the time that Officer Ziegler employed the takedown maneuver. *See Gaddis*, 364 F.3d at 774. At that point, Ziegler only had probable cause to arrest Plaintiff for the misdemeanor offense of operating a vehicle under the influence of alcohol. *See* Mich. Comp. Laws § 257.625(7)(a). This offense is only moderately severe from the perspective of "a reasonable officer on the scene." *Graham*, 490 U.S. at 396; *Gaddis*, 364 F.3d at 774. Indeed, there is no allegation that Plaintiff's offense was violent or otherwise resulted in any injuries.

While the video shows that Plaintiff moved his arms forward ahead of the takedown maneuver, Officer Ziegler does not allege that Plaintiff assaulted him or made any offensive gestures toward him.[10] And although the interaction occurred on a dark street early in the morning before either officer could pat down the suspects or call for backup, a reasonable jury could determine that Plaintiff's failure to promptly obey all of Officer Ziegler's orders did not place Ziegler in such a dangerous situation that a forceful takedown maneuver was reasonable.

There are also genuine disputes of fact regarding whether Plaintiff resisted arrest by taking actions that prevented Officer Ziegler from handcuffing him. There is no question that Plaintiff failed to comply with several of Officer Ziegler's orders and moved his hands in the air just as Ziegler was about to handcuff him; however, Plaintiff's behavior—particularly considering the disputes of fact that the video fails to clarify—does not necessarily amount to

---

[10]Officer Ziegler did claim that Plaintiff's movements made him worry that Plaintiff might flee or possibly injure him. (Police Report, R. 60-7, Ex. G, Page ID # 623.) However, the parties dispute whether Plaintiff's behavior was provoked by Ziegler due to his alleged aggressive tactics, and whether Ziegler gave Plaintiff sufficient opportunity to comply when he yelled out to Plaintiff a long list of orders over the course of only thirty seconds. *See supra* notes 2, 4, 6–8.

active resistance. *Woodcock v. City of Bowling Green*, 679 F. App'x 419, 423 (6th Cir. 2017) ("We have held that mere noncompliance is not active resistance.") (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323–24 (6th Cir. 2015); *see supra* notes 2, 4, 6–8. In fact, Plaintiff claims that he *had not been told* that he was being arrested at this point of the interaction.

The parties dispute whether Plaintiff's actions amounted to resistance given that, as Plaintiff emphasizes, placing one's hands in the air is a "universal and widely recognized sign of surrender." (*Compare* Appellee's Br. 6 *with* Appellants' Br. 2–4.) According to Defendants, Plaintiff's raised hands were an act of resistance rather than an indication that he had surrendered. But the fact that a suspect does not immediately surrender does not inherently mean that he is resisting. *See Woodcock*, 679 F. App'x at 423. Indeed, the district court emphasized that "hands in the air . . . *renders the person whose hands are in the air vulnerable to attack, to aggressive action and so forth*." (Summ. J. Hr'g Tr., R. 65, Page ID # 757 (emphasis added).) The court stated that it had a "hard time accepting that . . . hands in the air is a position of threat." (*Id.*) To be sure, we must (1) assess an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, and (2) defer to the clear, unaltered depiction of the facts displayed in the video, *Scott*, 550 U.S. at 378. But in this case, we cannot completely determine the nature of the interaction or the communications between Plaintiff and Officer Ziegler from the video alone. That task is best left to a jury.

Plaintiff and the district court rightly compare this case to our opinion in *Baker v. City of Hamilton*, 471 F.3d 601 (6th Cir. 2006). In that case, we held that qualified immunity is inappropriate where there is a dispute regarding whether a suspect stopped and raised his hands in the air during a police encounter, and a reasonable jury could conclude that the suspect's movements indicated that he had surrendered. *Id.* at 607–08. This case is factually analogous to *Baker* in various respects, even considering the fact that, unlike in *Baker*, the record includes a video depicting the moment when Plaintiff raised his hands in the air ahead of the takedown maneuver. (*Compare* Appellee's Br. 28 (citing to the dashcam footage) *with id.* at 603 ("What happened . . . is disputed by the parties and is the basis of [Plaintiff]'s complaint.").) That is

because a reasonable jury could view the video and determine that Plaintiff surrendered when he raised his hands.

Importantly, we have determined that the use of a takedown maneuver, in a variety of scenarios, can amount to excessive force. *See, e.g.*, *Harris v. City of Circleville*, 583 F.3d 356, 365–66 (6th Cir. 2009) (denying qualified immunity where officers employed a takedown maneuver after the suspect was already cuffed within the police station and the officers subsequently struck the suspect while pushing his handcuffed hands over his head, kicked him in the ribs, and referred to him using racist slurs); *McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) (concluding that a reasonable jury could find that an officer's use of a takedown maneuver was not objectionably reasonable where a suspect "made no aggressive gestures or statements, attempted to cooperate, offered no resistance, and stated that he would 'go easy'"); *Pershell v. Cook*, 430 F. App'x 410, 415 (6th Cir. 2011) (denying qualified immunity where, after performing a leg sweep and handcuffing a suspect, officers proceeded to strike the suspect three times, causing him to lose consciousness and sustain a hip fracture); *Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008) (denying qualified immunity where video footage "would permit a jury to conclude that [an officer]'s use of force in throwing [a suspect] to the floor [of the booking room of a police station] was disproportionate," where the suspect had merely insulted an officer, refused to comply with orders, and continually raised his hand); *Meirthew v. Amore*, 417 F. App'x 494, 497–98 (6th Cir. 2011) (denying qualified immunity where the officer used an arm-bar takedown in a police station booking room, where the suspect was unarmed, handcuffed, and surrounded by officers).

Considering the factors outlined by the relevant caselaw, this case presents genuine disputes as to Officer Ziegler's use of force, both as Ziegler engaged in the takedown maneuver and as he proceeded to "put pressure on [Plaintiff's] back, upper body, arms, and the side of his head." (Appellee's Br. 14); *McCaig*, 515 F. App'x at 555. Where, as here, the available video is not clear as to those factors, *see supra* notes 2, 4, 6–8, we must reject Ziegler's qualified immunity defense because a reasonable jury could find that his use of force violated Plaintiff's Fourth Amendment rights. *Godawa*, 798 F.3d at 463, 467.

**b.  Claim Against Officer Kerschen**

The district court erred when it determined that Officer Kerschen was not entitled to qualified immunity on Plaintiff's failure to intervene claim.  Plaintiff claims that Kerschen failed to stop Ziegler's allegedly excessive takedown and struggle, and that Kerschen had the "requisite notice, means, and opportunity to verbally and/or physically intervene on [Plaintiff's] behalf; however, he instead did and said nothing to aid [Plaintiff]." (Appellee's Br. 20.)  But an officer's "mere presence during [an] altercation, without a showing of some direct responsibility, cannot suffice to subject [him] to liability." *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013).  Indeed, "the Sixth Circuit has repeatedly held that officers are not liable under failure-to-intervene claims when the ostensible 'opportunity and means' to intervene does not last long enough for the officer to 'both perceive what was going on and intercede to stop it.'" *Pelton v. Perdue*, 731 F. App'x 418, 426 (6th Cir. 2018) (quoting *Burgess*, 735 F.3d at 475).

To overcome the timing and opportunity requirements for failure to intervene cases, Plaintiff argues that Officer Ziegler's use of force included the verbal orders at the beginning of Ziegler's encounter with Plaintiff.  Accordingly, Plaintiff contends that by the time that Ziegler employed the takedown maneuver, "despite the passage of one minute and 12 seconds," Kerschen "made no attempt whatsoever to move towards Plaintiff or offer any assistance whatsoever in arresting him." (Appellee's Br. 40 (emphasis omitted).)  For these reasons, Plaintiff claims, a reasonable jury could conclude that Kerschen had the opportunity and means to intervene and prevent the force used against him. (*Id.* at 38–40.)

The exchange between Plaintiff and Ziegler involved profane language and was certainly stern and loud.  However, that exchange was sufficiently distinct from the takedown maneuver that it might or might not be considered the same use-of-force incident. *See City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015) (holding that a Plaintiff "cannot establish a Fourth Amendment violation merely on tactics that result in a . . . confrontation that could have been avoided") (quotation marks and citations omitted).  Indeed, just moments before Officer Ziegler engaged in the maneuver, he put away his taser to free his hands so that he could handcuff Plaintiff and end the interaction.  At that point, Kerschen could not have been on notice that the contentiousness between Plaintiff and Ziegler would continue and would result in

Ziegler employing a takedown maneuver. And, importantly, Officer Kerschen did rush over to assist as soon as he secured Robbins' handcuffs. Contrary to Plaintiff's contentions, the video indicates that Officer Kerschen did not have enough time "to 'both perceive what was going on and intercede to stop it.'" *Pelton*, 731 F. App'x at 426 (6th Cir. 2018) (quoting *Burgess*, 735 F.3d at 475). Accordingly, Officer Kerschen was entitled to qualified immunity.

### ii.  Clearly Established

"Public officials are entitled to qualified immunity from suits for civil damages if *either* the official's conduct did not violate a constitutional right *or* if that right was not clearly established at the time of the conduct." *Latits*, 878 F.3d at 547 (citing *Godawa*, 798 F.3d at 463 (citing *Saucier*, 533 U.S. at 201–02) (emphasis added))). Accordingly, to affirm the district court's judgment as to Plaintiff's claim against Officer Ziegler, we must also determine that Plaintiff's claimed rights were clearly established in May of 2016.

"As a starting point, [Plaintiff] had a clearly established right to be free from excessive force." *Palma*, 2022 WL 594046, at \*16 (citing *Godawa*, 798 F.3d at 463). However, while "this general right is well known, the right at issue is not defined at such 'a high level of generality.'" *Id.* (quoting *Godawa*, 798 F.3d at 467). Rather, the claimed right must be sufficiently particularized so "that a reasonable official would understand that what he is doing violates that right." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011) (citation omitted). Stated otherwise, Plaintiff need not always put forth "a case directly on point" to show that his claimed rights were indeed clearly established at the time of the conduct. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam). That is because "courts 'ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Palma*, 2022 WL 594046 at \*16 (quoting *Ziglar v. Abbasi*, ---U.S.---, 137 S. Ct. 1843, 1867 (2017) (quoting *Saucier*, 533 U.S. at 202)) (quotations omitted). Plaintiff need not show that "the very action in question has previously been held unlawful, but . . . in light of pre-existing law, the unlawfulness [of the official action] must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Viewing the disputed facts in the light most favorable to Plaintiff, Officer Ziegler violated Plaintiff's clearly established right to be free from excessive force when he employed the takedown maneuver. While Defendants claim that no reasonable officer in Ziegler's shoes would have known that it was constitutionally excessive to use a takedown maneuver to subdue an intoxicated, uncooperative person, the extent of Plaintiff's cooperation is disputed here. (*Compare* Appellants' Br. 12, 21–22, 29 *with* Appellee's Br. 11–12, 17.)

We have held that takedown maneuvers are excessive when officers deal with a "generally compliant" suspect, and that the police may not use physical force against a subdued, non-resisting subject. *Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006). We have also established that such a maneuver is excessive when a suspect surrenders to the police, does not offer resistance, and/or when the interaction happens in the presence of multiple officers. *See id.*; *see also Harris*, 583 F.3d at 365–66; *see also Baker v. City of Hamilton, Ohio*, 471 F.3d 601 (6th Cir. 2006); *McCaig*, 515 F. App'x at 551; *Lawler*, 268 F. App'x at 387; *Meirthew*, 417 F. App'x at 496–97; *Stanfield v. City of Lima*, 727 F. App'x 841, 847–48 (6th Cir. 2018); *Mallory v. Whiting*, 489 F. App'x 78, 83 (6th Cir. 2012); *Scott v. Kent Cnty.*, 678 F. App'x 435 (6th Cir. 2017) (Moore, J., dissenting). Considering the totality of the circumstances, and viewing the facts in the light most favorable to Plaintiff, an objective officer in Ziegler's shoes was on "notice that his specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's denial of qualified immunity as to Officer Ziegler, and **REVERSE** the district court's denial of qualified immunity as to Officer Kerschen and **REMAND** for further proceedings consistent with this opinion.